### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00435-BAH** |
| **v.** | : | |
| | : | |
| **SAMUEL CHRISTOPHER FOX,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant to 30 days' incarceration, followed by 36-months' probation, and $500 in restitution.

**I.      Introduction**

The Defendant, Samuel Christopher Fox (Fox), participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

Fox pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building.  As explained herein, the government recommends a sentence of 30 days' incarceration, followed by 36-months' probation and $500 in restitution. Incarceration  is warranted  because Fox: (1) observed rioters breaking the windows of the Senate Wing doors; (2)  posted on Facebook photographs that he took of rioters vandalizing the

Capitol in order to breach it and he applauded their acts; (3) breached the Capitol through a broken window, demonstrating his knowledge of additional property destruction committed by the rioters; (4) expressed no remorse for his actions at the Capitol for almost a year and proclaimed after the riot that he would do it again; (5) actively spread false information in social media by downplaying the violence on January 6 and claiming that rioters were let into the Capitol by law enforcement; and (6) has had repeated contact with law enforcement in the past, and previously served a term of probation, but those instances did not deter this crime.

The Court must also consider that Fox's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, incarceration, followed by a term of probation, is warranted as Fox participated in a riot that actually succeeded in halting the Congressional certification and he publicly celebrated the violence on that day and only just recently expressed remorse for his actions, on the eve of sentencing.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent –

contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Fox's conduct and behavior on January 6.

*Fox's Role in the January 6, 2021 Attack on the Capitol*

In late December 2020 and early January 2021, Fox sent a number of posts on Facebook announcing his intentions to go to Washington, D.C. on January 6, and his hope for a "civil war". On December 24, 2020, Fox posted on Facebook that, "[t]he worst part of 2020 was seeing so many people be ok with actual voter fraud and IDC I hope Trump starts civil war." On January 1, 2021, Fox urged others to go to D.C. to attend a rally by reposting a message advertising possible transportation there by bus and then volunteering that he had "five more seats" to drive others to D.C. Fox then proclaimed that, "[t]he next time I see fireworks go off in DC I want to see them attached to traitor politicians. Unrelated, but see yinz on the 6th."





Pursuant to the terms of his plea agreement, Fox participated in a debriefing with the FBI and explained that he drove his SUV from Pennsylvania to D.C. As noted above, Fox advertised that he could take five others with him, and one person ultimately rode with him to D.C. on January 6.

Fox said that he attended the former President's rally on January 6 because he thought this was going to be his last rally and Fox had not been able to attend any of his prior rallies.

After the rally, Fox walked with the crowd to the United States Capitol. He said that he wanted to see "what would happen" there.

Fox entered the Capitol Grounds and settled on the Northwest side of the Capitol at the Parliamentarian doors, near the west stairs and the Senate Wing area.  He said that he thought

people were going there for a political protest, but when he got to the Capitol it seemed like "mass confusion."  Fox admitted that he saw rioters break a window on "a small white door." Fox noted that he took pictures of people who were getting "extra rowdy".  The door and individuals that Fox described are in his Facebook post below.



Fox admitted that despite witnessing the violence, he did not turn around and "walk away" because it was the first time he had seen anything like this.   He described the scene as "tough to watch but you couldn't look away either."  Fox "knew it was going to be big news and a big event" and said that he was curious and wanted to take a picture to show that he was there. Fox said that he wanted the picture to "show his kids in the future."

At approximately 3:12 p.m., about 25 minutes after rioters breached the Senate Wing doors at approximately 2:47 p.m., Fox entered the Capitol Building through a broken Senate Wing window as captured below on CCTV video:



Fox left the Capitol through a Senate Wing door after spending approximately 2 minutes in the Capitol.

*Social Media Posts*

Fox was recorded on CCTV taking a "selfie" shortly after he entered the Capitol building through the broken Senate Wing window.



A tipster provided the FBI images that Fox posted to Facebook on January 7, 2021, including the first image shown below of Fox taking a "selfie" after he entered the Capitol through the broken Senate Wing window.   Fox photographed himself outside of the Parliamentary door in the second photo, which he also posted to Facebook.





On January 7, 2021, Fox posted on Facebook, "Al [sic] the lefties pissing and moaning right now can take comfort in the fact we walked into a building that was ours instead of using politics to loot stores. We actually have reasons to be there, not virtue signalling [sic] twitter points. Your country is sold to the CCP, and if you have no idea what I'm talking about then you're the biggest problem, not patriots who wanted to knock and talk to Congress. I'd do it again, fight me."

On January 10, 2021, Fox used Facebook to spread false information. He claimed that, "[t]he capitol wasnt overthrown we were let in. More than enough police to herd out the mostly 60-something crowd." [sic]  Then on January 27, Fox continued with his spurious claims saying that, "[e]veryone is pretending the capitol was anything more than a rowdy tour group where five people were murdered by the police." [sic]

On April 28, 2021, three and a half months after the riot, Fox continued to advance this false narrative. He downplayed the violence that he witnessed on the part of rioters, and affirmed his previous lies claiming, "January 6th was a walking tour. The doors were open and only agents provocateur were breaking windows at the protest of the crowd. Absolutely a lie that anything violent happened there other than a black officer murdering a white women."

Fox's friends applauded his participation in the riots. On January 7, 2021, one friend called Fox a "Patriot" saying, "[t]hanks for being a Patriot today. Glab you got out of there in one piece" [sic] Fox responded, "[y]eah thanks man, feeling a little.. idk lost about it all. But definitely was a time. My mom called and wanted me to come home so I boogied before the action kicked off, but I just posted some pics the feeling there was pretty intense". Fox's friend closed with, "[o]h year [sic], I could imagine. Proud of you though."

On January 27, 2021 Fox was still receiving accolades. Another friend commented on Facebook, "THOUGH DUDE I GOTTA TEL YOU HOWINPROUD I AM OF YOU. You were there man. In the thick of th action. The minimal action it actually was but still." [sic] Fox responded the same day, "Haha o yes the violent insurrection, thanks bro I had to be there I thought something bigger might happen"., [sic]

*Fox's Interview*

As was his right, Fox declined to be interviewed by the FBI at the time of his arrest. Pursuant to the terms of his plea agreement, however, Fox agreed to a debriefing with the FBI. Fox was interviewed on January 5, 2022.

During the interview, Fox refused to provide the FBI with access codes to open his mobile telephone, which the FBI legally seized during his arrest. The FBI believes Fox's telephone might contain evidence of his illegal conduct on January 6 based on CCTV footage showing him taking a "selfie" with his cellphone and then posting the same selfie to his Facebook page (see images above).

In his interview, Fox explained that he drove from Pennsylvania to D.C. the morning of January 6 and took an acquaintance with him, one who eventually went into the Capitol with Fox and rode back to Pennsylvania with Fox after they left the Capitol. Fox attended the Trump rally and walked with a crowd to the Capitol after the rally because he wanted to see what would happen there. Fox went to the Northwest side of the Capitol. He recalled that when he was at the Senate Wing doors he witnessed rioters violently trying to breach the Capitol, as depicted in images that he posted on Facebook. Fox denied participating in the violence and property destruction but admitted that after the rioters breached the Senate Wing, he wanted to go into the Capitol to prove that he was a part of the riot. Once in, Fox took a picture of himself to prove his presence in the Capitol but decided to leave and drive home because he saw armed law enforcement officers.

Fox admitted posting on Facebook after the riot that he would repeat his actions at the Capitol. Fox had no immediate remorse for his actions and had a difficult time conveying sincere remorse during his interview. The Government asked Fox to submit a letter after the

interview as a last chance to express his feelings concerning his actions on January 6. Fox has now written a letter in which he reveals his motivation for participation in the riot, apologizes for his actions, and reveals personal things about his background. He also requests leniency at sentencing. The Government expects that defense counsel will provide this letter to the Court separately because of some of the private material included regarding Mr. Fox.

### The Charges and Plea Agreement

On June 16, 2021, Fox was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and 40 U.S.C. §§ 5104(e)(2). On June 23, 2021, he was arrested at his home in Pennsylvania. On June 28, 2021, Fox was charged by a four-count Information with 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On November 5, 2021, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Disorderly Conduct in the Capitol Building. By plea agreement, Fox agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Fox now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Fox faces up to six months of imprisonment and a fine of up to $5,000. He must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9. Fox is also subject to a term of probation of not more than five (5) years, pursuant to 18 U.S.C. § 3561(c).

13

IV.      **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of incarceration followed by a term of probation

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and  smelled chemical irritants in the air. No rioter was a mere tourist that day.

14

Additionally, while looking at Fox's individual conduct, the Court must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Fox personally engaged in violence or destruction, he would be facing additional charges and penalties for that conduct. The absence of violent or destructive acts by Fox is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Fox from most other misdemeanor defendants.  Fox's lack of violence and property destruction explains why he was charged only with, and permitted to plead to, a misdemeanor rather than felony.

While there is no evidence that Fox engaged in violence or destroyed property, he witnessed it and capitalized on other violent rioters' actions as it allowed Fox to breach the Capitol by climbing through a window that rioters smashed. Moreover, Fox, publicly celebrated the violence on Facebook, then later spread lies, claiming that the rioters were peaceful and that law enforcement officers provoked violence.

Fox has been commended by his friends for his actions at the Capitol. He sought the approval of others by posting photographs of himself on January 6 on social media photos, and some of his friends supplied that approval.

Fox's statements on social media after January 6 show a total lack of remorse. He posted, "I'd do it again, fight me!" He also falsely claimed that police murdered five people. Fox downplayed the violence of the rioters, ignoring the violence that he witnessed firsthand, and claimed that the rioters were engaged in nothing more than a "walking tour."

Now, facing his sentencing, Fox has expressed remorse. It is in that context in which the Court should consider the weight to accord it. *See United States v.  Matthew Carl Mazzocco,* 21-cr-0054-TSC, Tr. 10/4/2 at 29-30 ("But Mr. Mazzocco's remorse -- and I believe his remorse is sincere -- Mr. Mazzocco's remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). In sum, despite Fox's belated expression of remorse, the social media posts obtained by the FBI where Fox spread lies, applauded violence, and accepted accolades for breaching the Capitol, capture the essence of the nature and the circumstances of this offense and warrant the clear need for incarceration and a term of probation.

### B.  Fox's History and Characteristics

As set forth in the PSR, Fox has had repeated interactions with the criminal justice system, including misdemeanor convictions for public drunkenness, DUI, and retail theft.  Fox was sentenced to a fine, and 18 months' probation for his DUI conviction.

Fox also has convictions for several traffic code infractions, including convictions in 2018, 2019, and 2021. ECF 27 ¶¶ 26 – 28, 30.

Fox has owned and operated Westmoreland Movers, LLC in Latrobe, Pennsylvania since 2017. ECF 27 ¶ 54. Fox has been compliant with his conditions of pre-trial release.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[1] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

---

[1] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

Here, Fox's friends have praised him for participating in the riot. A sentence of incarceration, followed by probation, would provide general deterrence for anyone who would applaud or possibly repeat Fox's actions.

*Specific Deterrence*

Fox's statements on social media clearly demonstrate the need for specific deterrence for this defendant. Fox celebrated the violence of January 6 by posting images of rioters breaking the windows and doors of the Capitol, something he witnessed up close.  Knowing all this, Fox used Facebook and his own presence at the riot to spread propaganda that the media coverage was false and that the protest on January 6 was similar to a "walking tour".  It was not.

Fox also lied on Facebook that police murdered individuals, and claimed that "the Capitol wasnt [sic] overthrown we were let in." Fox's failure to acknowledge the dangers and violence of January 6, 2021, his spreading of propaganda relating to the attack on the Capitol, and his lack of remorse until the eve of sentencing, underscore the need for specific deterrence in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[2] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes.

---

[2] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

A probationary sentence should not become the default.[3] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth).

The government and the sentencing courts have made meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous and deserving of greater punishment. Those who trespassed, but engaged in significant aggravating conduct merit serious consideration for institutional incarceration. Those who trespassed but engaged in fewer or less serious aggravating factors deserve a sentence more in line with minor incarceration or home detention.

Fox has pleaded guilty to Count Four of the Superseding Information, charging her with disorderly and disruptive conduct in Capitol grounds, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

---

[3] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the following cases are appropriate comparators to this one, **as**

they also involved defendants who spent a relatively short amount of time in the Capitol but who were active publicly in expressing their lack of remorse, advancement of false narratives, or appreciation for the violence at the riot.

The Court may consider the sentence imposed in *United States v. Donna Sue Bissey*, 1:21-cr-00165 (TSC), a case similar to the instant case in that Bissey was in the Capitol for a relatively short period of time and posted images of rioters engaged in illegal conduct along with inflammatory comments.  Bissey and her friend (Morgan-Lloyd) remained in the Capitol for a little over ten minutes. While inside the Capitol building, Bissey appeared in a photo with Morgan-Lloyd. and two other rioters.  Bissey posted a screenshot of a Twitter post which stated, "This is the First time the U.S. Capitol had been breached since it was attacked by the British in 1814" and wrote "We were inside for reals!" Bissey, like Fox, was applauded for breaching the Capitol and acknowledged it in social media, and showed no remorse for her actions. She posted a photo on Facebook, tagging Morgan-Lloyd and another individual, and wrote "We are home. Thank You to ALL that messaged checking in and concerned. It was a day I'll remember forever. I'm proud that I was a part of it! No Shame. BTW turn off the #FakeNews." As noted above in footnote 3, this is one of the cases in which the Government made a very limited number of plea offers in misdemeanor cases early in the investigation and recommended a probationary sentence. The Court nonetheless sentenced Bissey to 14 days' incarceration.

The Court in *United States v. Brandon J. Miller*, 1:21-CR-266 (TSC) sentenced Miller to 20 days' incarceration.  Miller walked with a crowd to the U.S. Capitol and stood outside the building and observed people climbing on the building's walls. Miller breached the Capitol by climbing through a broken window by the Senate Wing door just as Fox did. Miller then publicly broadcast    his illegal presence over Facebook Live.   Miller remained in the Capitol

approximately 10 minutes. In his statements after January 6, Miller showed pride rather than remorse or contrition for his criminal conduct, and falsely claimed that he protest was peaceful. He also received accolades from a friend and suggested the need for a civil war. Miller had a number of arrests for various municipal and traffic related offenses as well as two criminal offenses, and 2015 and 2021 convictions for Possession of Marijuana Drug Paraphernalia.

The Court in *United States v. Frank J. Scavo*, 1:21-CR-254 (RCL) sentenced Scavo to 60 days' incarceration. Scavo entered the Capitol through the Rotunda Doors, where multiple assaults on law enforcement occurred, some of which Scavo captured on his cellphone. Despite witnessing violence, Scavo, entered the Capitol. Like Fox, Scavo and was only inside of the Capito for a short amount of time, approximately 10 minutes, but he was boastful about his participation and once inside the Capitol recorded statements on his cellphone about storming and taking back the Capitol. Scavo also downplayed the violence at the Capitol, and made public statements, including in a television interview, that either downplayed or made light of his conduct. Scavo was cooperative with his investigation and produced to the FBI evidence of his conduct at the Capitol. He also expressed remorse for his actions. Scavo had no prior convictions at the time of sentencing.

In *United States v. Rasha Abual-Ragheb,* 1:21-CR-00043 (CJN), the defendant entered the Capitol building through a doorway that had been violently breached by other rioters less than 30 minutes earlier. Like Fox, she was only inside the building for approximately 2 and a half minutes, but while inside she posed proudly for a photograph, which she posted on social media. Abual-Ragheb also used social media to spread false information about the 2020 Presidential election and repeatedly endorsed violence, including a post in which she urged others to bring firearms with them when they went to D.C. on January 6. After the riot she

23

defiantly announced on social media that she was ready to "burn" America.  In fact, she considered this a historical moment, claiming, "I was the only from my group to enter the capitol[;] Carlos [and] the rest run away and left me alone[;] I got teargas and pepper spray but I made history. . . ."  Abual-Ragheb proclaimed in social media that she would repeat her actions stating, "w[e]'ve been saying this for long time, I guess and I believe after being in DC and a witness it [sic] the people are more angry[;] Civil War is coming and I will be happy to be a part of it".  Abual-Ragheb had no prior convictions at the time of sentencing. The Court sentenced defendant to 36 months' probation, with 2 months of home detention.

In *United States v. Andrew Wrigley*, 1:21-CR-00042 (ABJ), defendant entered the Capitol building through the Upper West Terrace doors only four minutes after other rioters initially breached them. He went into the building for one minute and took a photograph of himself and proudly posted it in social media to show others that he participated in the riot. Wrigley's Facebook account was inaccessible the day after he posted his photograph.  Wrigley also had no prior convictions at the time of sentencing. The Court sentenced Wrigley to 18 months' probation, and 60 hours of community service.

In *United States v. Cindy Fitchett and Douglas Sweet*, 21-CR-41 (CJN), the defendants each received sentences of three years of probation, with 30 days home detention and 60 hours of community service. They were in the Capitol Visitor's Center for at least eight minutes. Fitchett filmed herself stating, "We are storming the Capitol. We have broken in." She saw chairs being thrown at officers inside, where she was arrested. Fitchett had observed an angry mob outside, including seeing a noose. Her codefendant, Douglas Sweet, took a photograph of a rioter climbing through a broken window at the Senate Wing Door and later gave an interview to a local reporter. Upon their arrest, both voluntarily gave FBI an interview. Unlike Fox, they

gave consent to search their phones. Fitchett had no prior convictions, while Sweet only had one prior criminal conviction for Contributing to the Delinquency of Minor in Mathews County, Virginia, from 2000.

Finally, in *United States v. Jackson Kostolsky*, 1:21-CR-00197 (DLF), the defendant took photographs of the crowds outside the Capitol, scaled the walls of the Capitol, texted photographs to friends stating that he had been tear gassed and bragged about climbing the wall. Kostolsky went inside the Capitol for only 30 seconds after the Parliamentarian doors had been breached but exited after approximately 13 seconds when Capitol police chased him and other rioters out. Kostolsky also admitted that he deleted videos from his phone that showed him inside of the Capitol. Kostolsky has no criminal history other than citations. The Court sentenced Kostolsky to 3 years' probation, 30 days of home detention, and GPS monitoring.

To be sure, defendants who engaged in conduct similar to Fox's have been sentenced to incarceration. *See*, e.g. *United States v. Donna Sue Bissey; United States v. Brandon J. Miller; and United States v. Frank J. Scavo.* While others have been sentenced to home detention (*See, e.g.*, *United States v. Rasha Abual-Ragheb; United States v. Cindy Fitchett and Douglas Sweet*; and *United States v. Jackson Kostolsky)* and probation *(see United States v. Andrew Wrigley).* But the requirement under 18 U.S.C. Section 3553(a)(6) that the sentencing court *consider* unwarranted sentencing disparities does not mean that a sentencing judge must impose a sentence that is no greater than those imposed on similarly situated defendants. In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the

result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

Considering all of the applicable factors, the government believes a 30-day term of incarceration, followed by 36 months' probation, and $500 in restitution is appropriate here.

V.      **The Court's Lawful Authority to Impose a Split Sentence**

The sentence requested by the government—30 days' incarceration, followed by 36-months' probation—is a lawful one. A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense, such as the crime at issue in this case. *See* 18 U.S.C. § 3561(a)(3). In addition, for a defendant convicted of any federal offense, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

> a.  *A sentence imposed for a petty offense may include both incarceration and probation.*

> i.   Relevant Background

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to

federal criminal sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences." Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment). Two provisions— one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[4] followed by a term of probation, such as the sentence requested by the United States here.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[5] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of

---

[4] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10). *See* Part V(b) *infra*.

[5] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence." 18 U.S.C. § 3551(b).

imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

ii.  Analysis

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation). In passing the Sentencing Reform Act, Congress sought generally to

abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583. S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background. But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b). *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam). In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at 808. In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-

29

offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."

30

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for three reasons. First, Section 3551(a) notes that the sentencing provisions described there apply "[e]xcept as otherwise specifically provided." Section 3561(a)(3) does "provide[]" "otherwise": it recognizes a carveout for petty offenses.

Second, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). When Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). *See supra*, at 23 (recounting statutory history). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Ibid.*

Third, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Ibid.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147-CKK, Doc. 70 at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991, *see supra*, at 23, does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the

difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation). Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation). No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense. Here, Sunstrum pleaded guilty to one count of 40 U.S.C. § 5104(d): Stepping on, Climbing, Removing, or Injuring Property on U.S. Capitol Grounds, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

>   ***b.  A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.***

>   i.  <u>Relevant Background</u>

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

>   remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term

of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*[6]

    ii.  <u>Analysis</u>

A sentencing court may impose one or more intervals of imprisonment up to a year (or, as here, up to the six-month statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time." 18 U.S.C. § 3653(b)(10). Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two

---

[6] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation." S. Rep. No. 225, 1983 WL 25404, at *98.

weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[7]  That would be an appropriate sentence in this case.

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure.  In this case, the government does not request that imprisonment be imposed through "intermittent" confinement as a condition of probation.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence of 30 days' incarceration, followed by 36-months' probation and $500 in restitution.

---

[7] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:    /s/ Anthony L. Franks
ANTHONY L. FRANKS
Missouri Bar No. 50217MO
Assistant United States Attorney
Detailee – Federal Major Crimes
United States Attorney's Office
for the District of Columbia
Telephone No . (314) 539-3995
anthony.franks@usdoj.gov